## LUDWIG OLIVEN V. HUGO KASTOR.

### Decided March 18, 1907.

**1.—Agent—Right to Take Over Property of Principal.**

An agent can not by a secret mental process and by a voluntary payment for the same out of his own funds without the knowledge or consent of the principal take over or invest himself with title to property originally bought by him for his principal.

**2.—Attachment—Cost.**

Where property seized by attachment is sold at the instance of the plaintiff and the proceeds, less the costs of sale, turned into the registry of the court, the defendant is entitled to the full amount for which the property sold, without diminution by the costs of sale, upon judgment in his favor.

Appeal from the District Court of Jefferson County. Tried below before Hon. L. B. Hightower, Jr.

*Baker, Botts, Parker & Garwood* and *Greers & Nall,* for appellant.—The plaintiff being at the time of the inspection and also at the time of the consummation of the purchases, the trusted and confidential agent of the defendant's firm, for the purchase of precisely the kind of property conveyed by the deed introduced in evidence over defendant's objection, his attempt to purchase these tracts for his own benefit was a fraud upon defendant's firm, which the law will not permit, and plaintiff thereby took the title to the property as trustee for defendant's firm, and said firm became the sole beneficial owner thereof. Bell v. Maximos, 85 Texas, 140; Satterthwaite v. Loomis, 81 Texas, 70; Barziza v. Story, 39 Texas, 355; Borden v. Houston, 2 Texas, 594, 607; Hendrix v. Nunn, 46 Texas, 147; 1 Am. and Eng. Ency. Law (2d ed.), 1082; 1 Clark & Skyles on Agency, pars. 408, 409, 404, 407.

The court erred in permitting the plaintiff to read in evidence conveyances evidencing any right or title in himself because at the time he was the sole manager of defendant's firm, Friedlander & Oliven, in the United States, it was his duty to buy stave timber for them, according to his best judgment, and he could not acquire an interest in the subject matter of his agency for the purpose of entering into competition with his principals. Cotton v. Rand, 93 Texas, 22; Bell v. Maximos, 85 Texas, 140; 1 Am. and Eng. Ency. of Law, pp. 1071, 1072, 1082; Borden v. Houston, 2 Texas, 607; Satterthwaite v. Loomis, 81 Texas, 70; Hendrix v. Nunn, 46 Texas, 147; Tinsley v. Penniman, 34 S. W. Rep., 367; Northern Pac. Ry. Co. v. Kindred, 14 Fed. Rep., 80; Michoud v. Girod (4 How., 555), S. C., Book 11, L. Ed., 1099.

*F. J. Duff* and *A. L. Davis,* for appellee.—The mere fact of a person being employed, whether it be as clerk, agent or manager of another, does not preclude his purchasing or becoming interested in property similar in kind to that being dealt in by his principal so long as he does not purchase or become interested in the particular property he is employed to purchase for his principal, and does not abuse his fiduciary relation to the prejudice of his principal. Wenham v. Switzer, 51 Fed. Rep., 351; Wenham v. Switzer, 59 Fed. Rep., 942; Pearsall v. Hirsch, 59 N. Y., Super. Ct., 410, 14 N. Y. Supp., 905.

GILL, CHIEF JUSTICE.—Hugo Kastor brought this suit against Ludwig Oliven to recover the value of certain staves alleged to have been made by Oliven from timber belonging to Kastor and which Oliven wilfully, knowingly and unlawfully had cut and carried away.

The defendant being a citizen and resident of the German Empire, plaintiff sought to give the court jurisdiction by original attachment levied upon certain staves belonging to defendant and situated within the jurisdiction of the court. The plaintiff while specifically praying for the value of the staves manufactured from timber alleged to belong to him, waived the tort and sued on an implied promise to pay the value of the timber taken. This in order to bring his demand within the definition of the word debt and thus furnish a proper basis for attachment.

The defendant Oliven answered by attorney admitting that through his agents he had cut and appropriated a part of the trees in controversy but he alleged that the trees were his own because acquired by plaintiff for defendant's benefit while plaintiff was acting in the capacity of sole agent and general manager of defendant in America. Defendant reconvened in damages for the wrongful levy of the attachment questioning his right to attachment in a suit for damages growing out of an alleged tort.

By trial amendment plaintiff admitted that he was agent of defendant as alleged at the time of the acquisition of the timber for which he sues, but he avers that he took the title to himself only after his principal had declined to ratify the purchase.

A trial by jury resulted in a verdict and judgment for plaintiff for $2,672.76 from which the defendant has appealed.

The following facts appear without dispute: In 1903 and 1904 there existed in Berlin, Germany, a firm doing business under the firm name of Friedlander & Oliven. Through agents they were conducting in the United States an exporting business of staves and cotton. With regard to the stave business, which was conducted separately, the method was as follows: The firm through its American manager would purchase from the owners of the land such standing trees as in the judgment of their inspectors were suitable for the manufacture of staves. Later the foreman through men hired for the purpose would fell the trees, convert them into staves, and transport them to deep water for export. In the early part of 1904 plaintiff was appointed by the firm as its American manager at a fixed salary, with offices and headquarters at Memphis, Tennessee. His authority was broad and general and all

the work was done under his supervision and control. The concern was operating in Tennessee, Mississippi, Arkansas, Louisiana and Texas, having found stave timber in each of those States. For the purchase of standing timber the concern had prepared printed forms to be filled out by the agents and signed by the land owner. In these printed forms Friedlander & Oliven were named as grantees and in each of the named States except Texas they were so executed. In Texas, however, for some reason unexplained by this record it had been the uniform practice to erase the name of the foreign firm and insert as grantee their manager, whoever he might be at the time.

In July, 1904, one Hudolin, plaintiff's foreman and inspector, reported to the Memphis office that he had found some valuable timber in Jasper County, Texas. Thereupon plaintiff came to Texas on the general business of the concern and after informing himself as to the character of the timber, made out transfers on the printed forms of the firm, inserting his own name as grantee instead of that of the firm, and gave the transfers to Hudolin who was authorized to procure the signatures of the landowners and draw on the firm through plaintiff for the purchase price which was one dollar per tree. The plaintiff thereupon returned to Memphis and Hudolin promptly procured the signatures, gave the drafts and forwarded the transfers to plaintiff at Memphis. Hudolin had previous to this and by the explicit direction of plaintiff inspected the timber, paid each of the grantors five dollars in cash as earnest money and had branded each tree "F. & O." the initials of the firm of Friedlander & Oliven. These transfers conveyed timber on four tracts of land in Jasper County. The one executed by Amos Richardson conveyed 1,474 trees on what was known as the 640 acre Montgomery survey. The one executed by Nantz conveyed 477 trees on the 320 acre Nantz survey. The one executed by Goode conveyed 609 trees on a 320 and 160 acre tract owned by him. Each of the trees conveyed by these instruments are described as numbered and branded "F. & O."

Hudolin while inspecting, numbering, branding and purchasing these trees was in the pay and employ of the firm and had no knowledge of any purpose on plaintiff's part to act in his own behalf in the acquisition of this property. The cost of inspecting and making these purchases was borne by the firm. Nantz, Goode and Richardson each supposed they were selling to the firm and did not know Kastor in the transaction except as agent and manager for the firm. They took the drafts drawn by Hudolin for the purchase money and cashed them at the local banks, having signed the transfers and delivered them to Hudolin for the firm. These transfers reached Kastor at Memphis about August 14, 1904. The drafts, however, had not been presented for collection at that time. All four of the tracts above described were situated on the Neches River and were subject to overflow.

On August 14, 1904, plaintiff received a letter written by the firm in Germany dated August 5 in which occurs this expression: "In reference to the new production we request you first of all to take care that under no circumstances whatsoever we will go into territory which is subject to overflow." Plaintiff claiming to construe this as a refusal to take the land subject to overflow paid the drafts out of his own funds and now asserts title to the timber in himself. He did not notify the

firm that he had thus sought to take over these purchases, nor did he so notify them until he set up the claim for the converted staves. Until the receipt of this letter plaintiff admits he was acting for the firm in this matter.

By the same authority and under similar instructions Hudolin purchased of Amos Richardson for the firm 957 trees on a 400 acre tract also on the river subject to overflow and adjoining the tracts hereinbefore described. This transfer and draft reached plaintiff at Memphis after the arrival of the letter from which the above language is quoted. This transfer also named plaintiff as the grantee but was in fact executed and delivered for the benefit of Friedlander & Oliven. The plaintiff paid for this out of the funds of the firm and does not question their title thereto. He explains this by saying that it was not quite as subject to overflow as the other and he was out of funds anyway.

He at no time notified Hudolin that he was claiming the first three tracts as his own, notwithstanding the trees stood in the brand of the firm and had been bought by Hudolin for the firm.

On September 14, 1904, plaintiff still acting as sole manager of the firm wrote explicit instructions to Hudolin to take his gang of stave makers and convert the timber on the Nantz and Goode tracts into staves. In the same letter he directed him to cut no timber from the 400 acres Richardson tract which he had last branded. He also directed him to begin nearest the river and cut all the branded trees. Hudolin never ceased to be in the employ and pay of the firm. Acting under these instructions Hudolin and his men made into staves 692 trees off of the Nantz and Goode and first Richardson tracts and the staves were exported. Plaintiff alleges that the tort was committed on November 1, 1904. His suit was filed on February 28, 1905.

In the fall of 1904 plaintiff tendered his resignation to take effect October 31, 1904. The company thereupon sent one Heyman to take his place as manager. At the request of the firm plaintiff remained in the office acting with Heyman, giving directions, signing checks and exercising the authority and drawing the salary of manager until December 31, 1904, when he severed his connection with the office. During all that time he did not disclose to Heyman his alleged ownership of these trees. He did have the $15 advance money charged to his own account on the books, and it is also true that while all other purchases were entered on the books so that the manager could always tell therefrom how many trees the firm owned and where they were situate, these purchases were never entered on the books of the firm. It is further true, however, that this timber was cut in accordance with directions contained in a letter from plaintiff written before the arrival of Heyman and was cut during the time when the plaintiff was to all intents and purposes the manager. This last is true because plaintiff knew every detail of the company's American affairs and in effect conducted the business even after Heyman's arrival up to the time of his actual withdrawal December 31, 1904.

Plaintiff states that he wrote Hudolin later not to touch the timber in controversy, but Hudolin swears this letter did not reach him, and manifestly it did not for he proceeded according to his first instructions.

Plaintiff says he informed Heyman that the Company had about 1,000

trees in Texas, but said nothing pro or con about the trees on the tracts in controversy. That they wired for Hudolin who went to Memphis and who was instructed to cut only those 1,000 trees and to be careful not to cut over the lines. Nothing was said to Hudolin about plaintiff's ownership or claim to those other trees. Plaintiff further says that after Hudolin returned to Texas he sent Hudolin a letter for the firm embodying the instructions which had been orally given him. A copy of this letter was adduced in evidence and instructed Hudolin to confine his operations to the 620 acre Elisha Morris survey and not to encroach on the lands of others. The only survey in Texas exceeding 480 acres on which the timber was conveyed was the Montgomery survey of 640 acres conveyed by Amos Richardson and claimed now by plaintiff. The one last conveyed by Amos Richardson contained only 400 acres. But these inconsistencies are immaterial for the fact remains that the firm remained in utter ignorance of plaintiff's claim. That Hudolin had previously received a letter under plaintiff's own hand to cut the timber in controversy and that Hudolin had bought and branded the timber for the firm and was never advised in any way that the trees he had branded did not belong to the firm.

Recurring now to plaintiff's relations with the firm in Germany the following statement will suffice. He testified that between the time Hudolin reported the discovery of this timber and the delivery of the deeds the firm had been advised of the prospective purchase and that it was subject to overflow. The members of the firm vigorously deny any such knowledge, but we find in deference to the verdict that the information was given. Aside from this fact and the extract from the letter plaintiff does not pretend that he had the firm's consent to take over the purchase, nor does he pretend that they ever had knowledge of his asserted purchase. The 672 trees as standing trees were at the time defendants took them of value in the sum found by the jury. The court did not submit the issue of their value when converted into staves.

The defendant tendered into court $672, the sum which plaintiff paid out for the trees when originally purchased.

We find that the undisputed proof shows that plaintiff was the sole manager of defendant until October 31, 1904, and from thence until December 31, 1904, he was in the employ of defendant as joint general agent with Heyman.

We further find that plaintiff undertook to purchase the timber in controversy for the purpose of converting it into staves and selling them in the markets of the world.

We do not deem it necessary to go with further detail into the evidence. There are 280 pages of it to a discussion of which the 403 pages of brief and argument are largely devoted.

We are of opinion that the decision of one question is controlling, and that upon that point the evidence is undisputed. Hudolin, with full authority, took the three transfers from Nantz, Goode and Richardson by the execution and delivery of which to Hudolin and the giving of the drafts to the vendors, the beneficial title passed to the firm. This consequence did not depend on the delivery of the transfers to plaintiff, nor the payment of the drafts with the firm's money. The documents had been executed by the owners and delivered to one authorized to

receive them. The vendors could not have annulled the transfers by refusing to cash the drafts and demanding the cancellation of their deeds, any more than the firm could have avoided liability on the drafts by returning the transfers. Had those drafts been dishonored they could have been enforced against the firm for they were unquestionably drawn with the firm's authority. This being true what is the legal consequence of plaintiff's voluntary payment of the drafts with his own funds?

Clearly he has had no transaction individually with either of the vendors. They have conveyed him nothing individually for they have not dealt with him in that capacity. The plaintiff has bought nothing from the firm and makes no pretense that he has. He has done no more than pay with his own funds and without the firm's knowledge three drafts which represented obligations against the company and for which plaintiff was in no sense liable. The firm owes him the return of the money thus paid out and has tendered the amount into court. In our judgment this is all there is in the case, and the sum tendered is all the plaintiff is entitled to recover, and as he has not sued for this he is entitled to it in this proceeding only because defendants have tendered it.

With reference to the knowledge of the firm plaintiff's statement is that "in the meantime the firm was advised that these lands *had been* purchased and that they were subject to overflow."

In our opinion the language of the firm's letter under which plaintiff seeks to justify the contention that the firm had refused to ratify the sale is not fairly susceptible to that construction. The firm knew that plaintiff was fully authorized to purchase timber and that any purchase he had made or any obligation he had entered into in the premises would bind the firm. The language can not be held to mean, "Annul all purchases of overflow timber." "Dispose of any such tracts as we now own." "Refuse to pay any outstanding obligations given in payment for such purchases." The language clearly referred to future transactions, and as conclusive of this it is undisputed not only that plaintiff for the company thereafter accepted and paid for the 400 acre Richardson tract lying on the river and subject to overflow, but under his direction in conjunction with Heyman the men were instructed to convert the timber thereon into staves. So that if it be material to the conclusion we have reached to find that the plaintiff did not have the defendant's consent or authority to take over this timber we would have no difficulty in so finding as matter of law. There is no room for difference of opinion on the issue.

To say that the plaintiff by a mere mental process might pass the beneficial title of the first three tracts, and by omitting that mental process allow the beneficial title of the fourth to go to the company, involves to our minds an absurdity, and yet this is what plaintiff's contention comes to at last. For no one will gainsay the assertion that the plaintiff might have paid for all the tracts with his own funds and later lawfully reimbursed himself from the company's funds. So after all to allow his contention would be to permit his undisclosed purpose to control the direction of the title. Had the timber proved worthless he could have charged the cost to his principal. Had the purchase proved valuable he could have disclosed his secret purpose or pretended a pur-

pose he never had and appropriate the profits to himself. Upon the point decided the controlling principle is elementary.

We do not deem it necessary to dispose of the other assignments. Appellants do not desire that the case be remanded on questions raised on their crossbill for damages for the levy of the attachment. We therefore ignore those assignments. We have stated the facts as fully as in our opinion the rights of the parties upon this appeal require. There is a vast amount of detail bearing to a greater or less degree upon the issue of good faith *vel non* on the part of the plaintiff and other issues not necessary to be determined on this appeal.

We are of opinion that the undisputed facts require that the judgment of the trial court be reversed and judgment be here rendered for defendant and it is so ordered. The sum tendered by defendant and paid into the registry of the court is awarded to plaintiff.

We must again protest against the inexcusable length of the briefs of appellant. One firm has filed a 119 page brief for appellant in which 38 assignments of error are presented, many if not most of them merely presenting one question in varying forms. Another firm also representing appellant has filed a 158 page brief presenting the same assignments and it was evidently prepared without reference to the first brief. These two are supplemented by a 43 page reply brief and a 19 page printed argument. There is nothing in the case to call for such a consumption of time and space. In view of the persistent growth of this evil we take this occasion to say for the benefit of the bar generally that we shall hereafter require cases to be rebriefed whenever it is apparent that counsel have made no effort to condense, and have filed briefs of such length as to uselessly consume the time of the court in their examination.

### ON MOTION TO REFORM THE JUDGMENT.

In the opinion filed in this cause on March 18, 1907, we failed to make a detailed disposition of certain items of cost and the proceeds of the sale of the attached property. As a consequence they were not included in the judgment as entered. The appellants by motion have suggested the reformation of the judgment.

The staves seized under the attachment issued at the suit of Kastor were sold during the progress of the litigation in response to a motion setting up the necessity for such sale to prevent deterioration in value. The proceeds, less the cost of making the sale, were turned into the registry of the court to abide the result of the litigation. That this fund went to appellant followed as matter of law from the reversal and rendition of the judgment. But the sheriff retained as costs of making the sale, commissions, etc., $817. For this item as well as all other costs Kastor is responsible. The motion is therefore granted, and the clerk is directed to so reform the judgment as to adjudge to the appellant a sum equal to the price for which the attached staves were sold and all costs, upon which will be applied as a credit the sum turned into the registry of the court by the sheriff and also the sum of $692 tendered to appellee by appellant, and these sums will be paid over to appellant.

*Reversed and rendered.*

Writ of error refused.